# In the United States Court of Appeals for the Fourth Circuit

ELEGANT MASSAGE, LLC D/B/A LIGHT STREAM SPA, on behalf of itself and all others similarly situated,
*Plaintiff-Appellee,*

*v.*

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY AND STATE FARM FIRE AND CASUALTY COMPANY,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 2:20-cv-00265 (Hon. Raymond A. Jackson)

**BRIEF OF AMICUS CURIAE
THE AMERICAN TORT REFORM ASSOCIATION
IN SUPPORT OF APPELLANTS AND REVERSAL**

H. Sherman Joyce
Lauren Sheets Jarrell
AMERICAN TORT
  REFORM ASSOCIATION
1101 Connecticut Ave.
  NW
Suite 400
Washington, DC 20036
(202) 682-1163

Steven P. Lehotsky
Scott A. Keller
Jeremy Evan Maltz
LEHOTSKY KELLER
  LLP
200 Massachusetts Ave.
  NW
Washington, DC 20001
(512) 693-8350

Katherine C. Yarger
  *Counsel of Record*
LEHOTSKY KELLER LLP
700 Colorado Blvd. #407
Denver, CO 80206
(303) 717-4749
katie@lehotskykeller.com

*Counsel for Amicus Curiae*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Rules 26.1(a)(2)(A) and (a)(2)(C), the American Tort Reform Association (ATRA) certifies that it is a non-profit corporation organized under the laws of the District of Columbia. ATRA has no parent entity, and no publicly held corporation or similarly situated legal entity has 10% or greater ownership of ATRA.

Under Fourth Circuit Rule 26.1(a)(2)(B), ATRA further certifies that it is unaware of any publicly held corporation or similarly situated legal entity, other than those listed in Appellants' corporate disclosure statement, that has a direct financial interest in the outcome of this litigation by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement.

/s/ Katherine C. Yarger
Katherine C. Yarger
*Counsel of Record for Amicus Curiae*
*The American Tort Reform Association*

# Table of Contents

Page

Circuit Rule 26.1 Disclosure Statement................................................................i

Table of Authorities ...........................................................................................iii

Interest of Amicus Curiae ....................................................................................1

Introduction .........................................................................................................2

Argument ..............................................................................................................6

I.   If allowed to stand, the district court's lax application of Rule 23's otherwise-stringent requirements would impermissibly allow class certification in countless cases involving nothing more than standardized contracts. ........................6

II.  Improperly certified class actions pose enormous consequences for American businesses, their employees, and their customers.................................................................19

Conclusion...........................................................................................................23

Certificate of Compliance ..................................................................................25

Certificate of Service .........................................................................................26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Express Co. v. Italian Colors Rest.,*
570 U.S. 228 (2013)...................................................................10

*Am. Gen. Life & Acc. Ins. Co. v. Wood,*
429 F.3d 83 (4th Cir. 2005).....................................................18

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)............................................................8, 9, 10

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011)...................................................................20

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975).............................................................20, 22

*Chavez v. Plan Benefit Servs., Inc.,*
957 F.3d 542 (5th Cir. 2020)...................................................19

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013)..............................................................7, 9, 10

*Coopers Lybrand v. Livesay,*
437 U.S. 463 (1978)...................................................................20

*Cruson v. Jackson Nat'l Life Ins. Co.,*
954 F.3d 240 (5th Cir. 2020)...................................................18

*Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.,*
2022 WL 433006 (E.D. Va. Feb. 11, 2022) .................3, 4, 11, 14

*Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.,*
506 F. Supp. 3d 360 (E.D. Va. 2020) .....................................16

*EQT Prod. Co. v. Adair,*
764 F.3d 347 (4th Cir. 2014)....................................................4, 7, 14

*Flecha v. Medicredit, Inc.,*
946 F.3d 762 (5th Cir. 2020).............................................................20

*General Telephone Co. of Southwest v. Falcon,*
457 U.S. 147 (1982).......................................................................8, 10

*Halliburton Co. v. Erica P. John Fund, Inc.,*
573 U.S. 258 (2014)............................................................................10

*Marcus v. BMW of N. Am., LLC,*
687 F.3d 583 (3d Cir. 2012) ..............................................................19

*Sacred Heart v. Humana Military,*
601 F.3d 1159 (11th Cir. 2010).........................................................18

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.,*
559 U.S. 393 (2010)............................................................................20

*Spagnola v. Chubb Corp.,*
264 F.R.D. 76 (S.D.N.Y. 2010).........................................................18

*Taylor v. Sturgell,*
553 U.S. 880 (2008).............................................................................7

*Uncork & Create LLC v. Cincinnati Ins. Co.,*
27 F.4th 926 (4th Cir. 2022)...............................................................7

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011)....................................................................*passim*

**Rule**

Fed. R. Civ. P. 23(b)(3) ..................................................................*passim*

**Other Authorities**

American Tort Reform Association, Legal Services Advertising
   in the United States 2017-2021 (Feb. 22, 2022),
   https://bit.ly/3MxsYnN.......................................................................21

Brian T. Fitzpatrick, *An Empirical Study of Class Action
   Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud.
   811 (Dec. 2010) .................................................................................21

Carlton Fields 2022 Class Action Survey,
   https://bit.ly/3m1TTvA..............................................19, 21, 22, 23

Citizens Against Lawsuit Abuse, Impact of Tort Costs and the
   Potential Economic Benefits of Tort Reform in the United
   States (Feb. 2021), https://bit.ly/3sKKz2t ..................................6, 22

Henry J. Friendly, Federal Jurisdiction: A General View (1973)....................19

John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit,
   Voice, and Loyalty in Representative Litigation*, 100 Colum. L.
   Rev. 370 (2000) .................................................................................10

Perryman Group, Economic Benefits of Tort Reform (Dec.
   2021), https://bit.ly/3htpkNe....................................................22, 23

Stephen B. Burbank, *The Class Action Fairness Act of 2005 in
   Historical Context: A Preliminary View*, 156 U. Pa. L. Rev. 1439
   (2008) ....................................................................................................9

## INTEREST OF AMICUS CURIAE

The American Tort Reform Association (ATRA) is a broad-based coalition of businesses, corporations, municipalities, associations, and professional firms that have pooled their resources to promote reform of the civil justice system with the goal of ensuring fairness, balance, and predictability in civil litigation.[1] For more than three decades, ATRA has filed amicus briefs in cases involving important liability issues, including class actions. Improperly certified class actions significantly harm American businesses by pressuring them to settle even meritless claims. ATRA thus has a keen interest in ensuring that the courts rigorously and consistently analyze whether plaintiffs have properly satisfied all the requirements of Federal Rule of Civil Procedure 23 before certifying a class.

---

[1] No counsel for a party authored this brief in whole or in part, and no such counsel nor any party here contributed money to fund this brief or its submission. Defendants consent to the filing of this brief; Plaintiff takes no position.

## INTRODUCTION

This Court should reverse the district court's certification of the class here and reaffirm Federal Rule of Civil Procedure 23's bedrock safeguards designed to protect the rights of class-action litigants. For the second time in this case, the district court improperly certified a class. After this Court summarily reversed the district court's first certification order, the district court certified yet another class. This time, it concluded that the existence of a standard contract was enough to give rise to a Rule 23(b)(3) damages class—regardless of the myriad complicated and individualized facts that affect the parties' rights and obligations under the contract. The class-certification order here reflects a fundamental misunderstanding of Rule 23 that, if adopted by other courts, would insert significant mischief into class-action jurisprudence.

The claims in this case concern Defendants-Appellants State Farm's denial of insurance coverage for some Virginia businesses. Plaintiff asserts that a series of Virginia executive orders related to COVID-19 caused Plaintiff (and other businesses) covered losses under a standard State Farm

business insurance policy. Plaintiff sought (and received) certification of a class of businesses unified only by a standard insurance policy and State Farm's denial of their claims: "policyholders in Virginia with Policies who submitted claims for business income losses and/or extra expenses" allegedly arising from Virginia's COVID-19 orders, "which were denied." *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 2022 WL 433006, at *13 (E.D. Va. Feb. 11, 2022).

But whether State Farm improperly denied those businesses' claims depends on resolution of a variety of business-specific considerations that will frustrate collective resolution of putative class members' claims. While it is broadly true that Virginia imposed COVID-19 restrictions on many businesses, those orders imposed different requirements on different businesses at different times. Consequently, the record reflects that State Farm's individual claim denials rested on the individual circumstances of those businesses.

Nevertheless, the district court certified a Rule 23(b)(3) class of (1) all Virginia business (2) holding a standard State Farm insurance policy;

(3) "that were subject to partial or full business suspension" under the more than 10 executive orders issued by the Virginia state government; and (4) were denied insurance claims for "business income losses and/or extra expenses." *Id.* at *20. Because Plaintiff asserted a class under Federal Rule of Civil Procedure 23(b)(3), the district court concluded that the purportedly common issue—the "uniform[]" denial of claims under the policies—predominated over individualized issues. *Id.* at *18. But, as State Farm's brief highlights, even an allegation of "uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement." Appellants' Br. at 12-13 (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 366 (4th Cir. 2014)) ("Br."); *see also id.* at 28-29 (collecting similar cases).

What the court's sweeping class-certification order ignores, therefore, are the myriad ways in which the various executive orders affected different businesses differently—both on the face of the orders and in businesses' (and their customers') responses to those orders. The interaction between the orders, the terms of the insurance policies, the policy-holding businesses' responses, and the public's responses produces individualized issues of

coverage and damages that outweigh any common questions about the interpretation of the standard policies. *See* Br. at 17-27. Once all of the individualized issues are stripped away, the remaining "common issue" concerns multiple individual denials of coverage.

That is not a question capable of "generat[ing] common *answers* apt to drive the resolution of the litigation," as Rule 23 requires. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). *See* Br. at 17-30. And, even if it were a truly common issue, it would not predominate over the individualized issues that run throughout Plaintiff's theory. Fed. R. Civ. P. 23(b)(3). *See* Br. at 30-33. Consequently, if adopted by other courts, the district court's order would permit class certification any time a single plaintiff identifies a standard contract and *alleges* a scheme to deny benefits to policy-holders.

The prevalence of standard contracts means that the district court's interpretation would permit courts to certify countless cases that do not satisfy Rule 23. As other courts of appeals have recognized, *see infra* p.17-19, fact-specific, business-by-business analyses of contractual disputes are not properly resolved through class actions. Given the immense settlement

pressure that class certification imposes on class-action defendants, the effect of such widespread class certification would affect the entire economy. *E.g.*, Citizens Against Lawsuit Abuse, Impact of Tort Costs and the Potential Economic Benefits of Tort Reform in the United States (Feb. 2021), https://bit.ly/3sKKz2t (CALA Report). Accordingly, this Court should reverse the district court.

**ARGUMENT**

**I.     If allowed to stand, the district court's lax application of Rule 23's otherwise-stringent requirements would impermissibly allow class certification in countless cases involving nothing more than standardized contracts.**

The district court's certification violates key class-certification principles, and would provide for class certification arising from any standardized contractual language. Rule 23 does not permit such an outcome, as other courts of appeals have recognized.

Importantly, this brief assumes for the sake of argument that the district court properly interpreted the policies. Appellants, this Court, and other federal courts have provided persuasive arguments that policies' "direct physical loss" requirement necessitate the insured show some physical

alteration to property—and COVID-19 closure orders do not result in such physical alteration. *Uncork & Create LLC v. Cincinnati Ins. Co.*, 27 F.4th 926, 932 (4th Cir. 2022); Br. at 35 n.4, 36-37, 39 n.6, 42 n.7 (collecting cases). Likewise, State Farm has argued that the policies' Virus Exclusion also precludes coverage. Br. at 24-25, 44-53.

**A.** Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," and thus strict adherence to Rule 23's safeguards is necessary to avoid the stresses that class certification imposes. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (cleaned up); *see also Taylor v. Sturgell*, 553 U.S. 880, 901 (2008) (noting that Federal Rule of Civil Procedure 23's demanding requirements are "grounded in due process"). Thus, "[p]rior to certifying a class, a district court must definitively determine that the requirements of Rule 23 have been satisfied, even if that determination requires the court to resolve an important merits issue." *EQT*, 764 F.3d at 361.

Rule 23(a) imposes four "[p]rerequisite[]," "threshold requirements applicable to all class actions": numerosity, commonality, typicality, and

adequacy of representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).

Most relevant here, commonality requires class-action plaintiffs to demonstrate that their claims turn on a "common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.[2] Thus, as the Supreme Court has explained, class-action plaintiffs must do more than raise "common 'questions'—even in droves"—but rather must raise

---

[2] Commonality is also important here because it affects both typicality and adequacy of representation:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58, n.13 (1982).

questions that are capable of "generat[ing] common *answers* apt to drive the resolution of the litigation." *Id.* (citations omitted).

**B.** Rule 23(a)'s safeguards are especially important in the context of Rule 23(b)(3) class actions, which require plaintiffs to "*affirmatively demonstrate*" that "class issues predominate" and a "class action is a superior method of adjudicating the dispute." *Id.* at 350, 362-63.

As the Supreme Court has recognized, damages classes permitted under Rule 23(b)(3) are an especially "'adventuresome innovation,' . . . designed for situations 'in which class-action treatment is not as clearly called for.'" *Comcast*, 569 U.S. at 34 (quoting *Dukes*, 564 U.S. at 362); *accord Amchem*, 521 U.S. at 614-15. The provision's drafters "were aware that they were breaking new ground and that [the resulting] effects might be substantial." Stephen B. Burbank, *The Class Action Fairness Act of 2005 in Historical Context: A Preliminary View*, 156 U. Pa. L. Rev. 1439, 1487 (2008). So Rule 23(b)(3)'s drafters included important safeguards to prevent "their new experiment" from "open[ing] the floodgates to an unanticipated volume of litigation in class form." John C. Coffee, Jr., *Class Action Accountability:*

*Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 401-02 (2000).

As a result, Rule 23(b)(3) "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Named plaintiffs in Rule 23(b)(3) class actions therefore must "*prove*—not simply plead—that their proposed class satisfies" Rule 23's criteria. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). District courts, in turn, "must conduct a 'rigorous analysis' to determine whether" the plaintiffs have carried that burden. *Comcast*, 569 U.S. at 35; *see Falcon*, 457 U.S. at 161. Only this way can the courts ensure that proposed classes conform to the "mission" of the "demanding" predominance requirement: to "assure the class cohesion that legitimizes representative action in the first place" by precluding classes in which the members' claims have factual and legal idiosyncrasies that defeat class unity. *Amchem*, 521 U.S. at 623.

**C.** Here, neither Plaintiff nor the district court demonstrated that the proposed class meets Rule 23's rigorous requirements. If left uncorrected,

the district court's approach would allow for class certification in *any* case that includes form contracts or standardized contractual language. That result does not accord with Rule 23, nor with the holdings of other courts of appeals.

**1.** Fundamentally, the proposed class lacks a truly common question that "is capable of classwide resolution . . . in one stroke." *Dukes*, 564 U.S. at 350. And even if the proposed class satisfies the commonality requirement, plaintiff has failed to "*affirmatively demonstrate*" that "class issues predominate" over individualized issues. *Id.* at 350, 362-63.

The purportedly common question—that class members were improperly denied benefits under a common policy—is defined at too high a level of generality. Specifically, Plaintiff purports to represent a class unified by an "identical [insurance] Policy" and a "common injury": denial of insurance claims arising from a set of Virginia orders governing how businesses could operate in the face of the COVID-19 crisis. *Elegant Massage*, 2022 WL 433006, at *16 ("Beginning in March 2020, the Commonwealth of Virginia and the federal government issued COVID-19 pandemic closure orders. As a result,

Plaintiff, and other similarly situated business, suspended operations, lost income, and incurred extra expenses."). In other words, the "common issue" in this case is whether members of the purported class were entitled to recover benefits under an identical insurance policy.

Resolution of that question, however, requires resolution of multiple individualized sub-questions that turn on differences among the class members' businesses and alleged injuries. These individual questions will inevitably predominate over common questions.

Whether any policy-holding business has suffered an "injury" from an improperly denied claim—and how much it was entitled to collect under the policy—depends on whether its claim was, in fact, improperly denied. *See* Br. at 28. As Appellants' brief recounts in detail, answering that question depends on the business-by-business interaction of at least four factors: (1) at the threshold, whether Virginia's orders even applied to the business and, if so, what requirements the orders imposed on the business and when; (2) interpretation of interrelated provisions of the State Farm policies as applied to the orders and the particular businesses; (3) how individual businesses

responded to the orders and implemented any restrictions; and (4) customers' and other's response to both COVID-19 generally and individual businesses' respective responses.

All of these considerations are necessary to evaluating whether any business was entitled to recover under the policy—and *how much*. And, as discussed in greater detail below at pp.15-17, they raise fundamental differences among the purported class that cannot simply be cast aside as irrelevant to the purported "common injury" of uniformly denied insurance claims. Under this Court's precedent, a mere allegation of a Defendant's "uniform conduct"[3] is insufficient to overcome the myriad individualized questions in this case:

> [T]he mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement. The predominance inquiry focuses not only on the existence of common questions, but also

---

[3] Importantly, even State Farm's denial of multiple insurance claims is not "uniform conduct" because each individual denial was based on individualized decisions. *See* Br. at 28. Thus, at most, the record here demonstrates a uniform *outcome* for members of the proposed class.

on how those questions relate to the controversy at the heart of the litigation.

*EQT*, 764 F.3d at 366; *see also* Br. at 16, 27-30 (discussing *EQT*). Yet that is exactly what the district court did when it concluded that the certified class overcame the differences among class members: The court credited Plaintiff's mere allegation that "Defendants" engaged in "uniform conduct" by "den[ying] every claim filed for loss of income and/or extra expenses that class members submitted." *Elegant Massage*, 2022 WL 433006, at *14; *see also id.* ("The various impacts of the Orders, in other words, do not disqualify Plaintiff because the ultimate bases for Plaintiff's and the proposed class members' claims are the Policy and Defendants' uniform conduct."). Much like in *EQT*, therefore, the district court's emphasis on State Farm's alleged uniform conduct here "placed an inordinate emphasis on" alleged "uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability." *EQT*, 764 F.3d at 366.

More fundamentally, if an allegation of uniform conduct were enough to paper over profound commonality and predominance problems as to ultimate liability, then every purported class will be able to engage in artful

pleading to circumvent Rule 23's safeguards. *Dukes*, 564 U.S. at 349 ("[A]ny competently crafted class complaint literally raises common 'questions.'") (cleaned up). Properly understood, the issue in this case is not whether State Farm denied insurance claims; the question is whether State Farm improperly denied insurance claims based on the facts and circumstances of individual businesses.

**2.** The lead Plaintiff here demonstrates some of the complications that the claims in this case present—and the individualized issues that arise, particularly when assessing damages (if any). Plaintiff's business highlights that Virginia's orders applied differently to different businesses at different points in time. These differences affect all aspects of liability under the policy and damages: (1) "direct physical loss," which is a necessary requirement for coverage; (2) causation of those losses, and thus whether the losses are covered; and (3) whether the claims meet other coverage requirements like the requirement that losses come in a "period of restoration." *See* Br. at 4-5 (identifying precise contractual requirements for coverage).

For instance, different government orders were in place at different times. Plaintiff is a massage parlor. Br. at 2. Initially, Executive Order 53 required massage parlors to close to public access on March 24, 2022. *Id.* at 3. But less than a month and a half later on May 8, 2022, Executive Order 61 allowed massage parlors to reopen with certain COVID-19 precautions in place. *Id.* at 3-4. The orders applying to other businesses, however, have different effective dates, different reopening dates, and different requirements for operating—which all profoundly influence the effects on those businesses. *See id.* at 3, 11-12, 17-21.

By way of example, massage parlors like Plaintiff faced relatively strict restrictions when the order was in effect, likely because of the increased risk of transmission of COVID-19. *Id.* at 19; *accord Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp. 3d 360, 379 (E.D. Va. 2020) ("[T]he Executive Orders specifically classified Plaintiff's type of property, a spa, as a hotspot for COVID-19 and, thus, selectively ordered that it be closed as a preventative health measure."). Retail businesses, by contrast, were allowed to remain open and serve the public. Br. at 18. And even when restaurants

were required to cease in-restaurant dining, they could offer delivery and takeout. *Id.* Thus, even if the orders were in effect for identical periods of time, they required vastly different things from regulated businesses due to the nature of the businesses' services. The district court's certification decision does not take these crucial differences into account.

Finally, Plaintiff's unique reaction to the Virginia orders illustrates that businesses vary in how they—and their customers—responded to the executive orders, which affects the businesses' coverage under their policies and any resulting damages. Plaintiff, *unlike* many Virginia businesses, did not attempt to reopen when it could do so. *See id.* at 3-4. Furthermore, Plaintiff closed its business *before* being required to by the executive orders—for business reasons unrelated to the public health emergency. *See id.* at 2-3.

**D.** In light of these individualized issues, the only truly "common issue" in this case is that State Farm had a standard insurance policy and, allegedly, denied claims under the policy. But that will be true for any number of insurance policies across the country. Moreover, American businesses use form contracts in every aspect of their business—and with sufficiently

artful pleading, the district court's order would allow for class certification of claims involving those contracts as well. *See Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83, 88 (4th Cir. 2005) (noting that "the bulk of contracts signed in this country, if not every major Western nation," are standardized contracts).

Even among courts that view form contracts as more amenable to class treatment, proposed classes fail the predominance requirement where "individualized extrinsic evidence bears heavily on the interpretation of the class members' agreements." *Sacred Heart v. Humana Military*, 601 F.3d 1159, 1176-77 (11th Cir. 2010).[4] The "risk of voluminous and individualized extrinsic proof runs particularly high where a defendant raises substantial affirmative defenses to breach." *Id.*

---

[4] *Accord, e.g.*, *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 255 (5th Cir. 2020); *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98 (S.D.N.Y. 2010) ("[C]ourts have denied certification even in cases that involved form contracts where numerous individual inquiries were required to determine whether a breach of the contract could be found. . . . [N]umerous courts have found that the predominance requirement is not satisfied where class claims are subject to a unique defense.") (collecting cases).

Here, as described above at pp.15-17, this case is replete with the kinds of fact-dependent questions that other courts of appeals have observed are fatal to a finding of predominance.

## II. Improperly certified class actions pose enormous consequences for American businesses, their employees, and their customers.

A district court's duty to rigorously analyze the named plaintiffs' evidence supporting class certification "is not some pointless exercise[.] . . . It matters." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 547 (5th Cir. 2020). If allowed to stand, the district court's interpretation is not only legally incorrect—it has profound practical consequences. Insurance disputes account for 13.5% of all class-action matters and 13.6% of all class-action spending in the United States. *See* Carlton Fields 2022 Class Action Survey 9, https://bit.ly/3m1TTvA (Class Action Survey).

The decision to certify a class has aptly been described as not only "a game-changer," but "often the whole ballgame." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 n.2 (3d Cir. 2012). Class certification exerts enormous pressure on defendants to capitulate to abusive "blackmail settlements." Henry J. Friendly, Federal Jurisdiction: A General View 120 (1973). Upon

certification, a class action's stakes immediately become so great that defendants often have little choice but to settle even claims "which by objective standards may have very little chance of success." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740 (1975). "Certification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense." *Coopers Lybrand v. Livesay*, 437 U.S. 463, 476 (1978); *accord AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011) (noting the "risk of 'in terrorem' settlements that class actions entail"); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*, 559 U.S. 393, 445 n.3 (2010) (Ginsburg, J., dissenting) (noting that class certification "places pressure on the defendant to settle even unmeritorious claims" because of "'potentially ruinous liability'").[5]

---

[5] When courts improperly certify classes, that can also negatively affect prospective plaintiffs. *See Flecha v. Medicredit, Inc.*, 946 F.3d 762, 770-71 (5th Cir. 2020) (Oldham, J., concurring) ("[A] post-certification judgment can prevent unnamed class members from bringing their claims again.") (citations omitted). This is particularly important in classes certified under Rule 23(b)(1) or (2) for which there is no opt-out opportunity.

Accordingly, virtually all certified class actions "end in settlement" before trial. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 812 (Dec. 2010). Indeed, in 2021, companies reported settling 73.1% percent of class actions. *See* Class Action Survey at 26. This represents a dramatic uptick from 60.3% in 2019 and 58.5% in 2020. *Id.* As more class actions are filed, attorney advertising has similarly risen: Reports estimate that attorneys spent approximately $971.6 million on 15.1 million television advertisements. *See* ATRA, Legal Services Advertising in the United States 2017-2021 (Feb. 22, 2022), https://bit.ly/3MxsYnN.[6]

Class-action litigation costs in the United States are huge. In 2021, they totaled a staggering $3.37 billion, continuing a rising trend that started in 2015. Class Action Survey at 7. Experts expect those costs to rise yet again in 2022 to $4.64 billion. *Id.* In addition to direct compensation to allegedly injured class members, settlements often require business to change certain

---

[6] Companies have reported that many proposed classes suffer from an "absence of commonality and predominance," and thus 75.9% have been able to assert a successful defense on that basis. Class Action Survey at 29.

business practices, make charitable contributions, or provide other forms of non-monetary compensation. *Id.* at 28. Class actions thus force defendants to divert resources away from socially productive activities. *See Blue Chip Stamps*, 421 U.S. at 740 (the "very pendency" of class action "may frustrate or delay normal business activity").[7]

Indeed, abusive lawsuits result in over $284.847 billion in excessive tort costs each year. *See* The Perryman Group, Economic Benefits of Tort Reform 1, 10 (Dec. 2021), https://bit.ly/3htpkNe (Perryman Report). Tort defendants ultimately pass along these costs to consumers and employees through higher prices, lower wages, and even lost jobs. Excessive tort costs result in $429.35 billion in lost output, $111 billion in lost tax revenue, and 4.24 million lost jobs "when dynamic effects are considered." *Id.* at 7; *accord* CALA Report at 10 (noting job losses across six studied States). In total, excessive tort costs amount to an annual "tort tax" of $1,303.10 for every

---

[7] Since 2011, the percentage of businesses facing class actions has ranged between approximately 50% to nearly 61%. Class Action Survey at 8.

American. Perryman Report at 13.[8] More generally, excessive tort costs increase the cost of doing business, which discourages innovation and employment—all decreasing consumer welfare. *Id.* at 4. By 2020, businesses "increased the percentage of the budget they allocate to class actions to 14.2% from almost 13%." Class Action Survey at 6. "Spending on class actions increased to cross the $3 billion threshold for the first time." *Id.*[9]

If the proposed class in this case is allowed to stand, it will only exacerbate the problem of class-action abuse in America.

## CONCLUSION

This Court should correct the district court's fundamental misapplication of class-action law.

---

[8] Though these costs affect the entire economy, they are troubling linked to higher health care costs and decreased "availability of medical services." Perryman Report at 4.

[9] The American tort system has "the highest liability costs as a percentage of GDP among the advanced western countries of the US, Canada, and the Eurozone." Perryman Report at 4-5. Studies attribute this difference to "both higher frequency of claims and higher claims cost in the US." *Id.* at 5. Class actions appear to contribute to this disparity, as 90.2% of American businesses say they face actions that are only filed in the United States. Class Action Survey at 19.

Dated: November 1, 2022

Respectfully submitted,

*/s/ Katherine C. Yarger*

H. Sherman Joyce
Lauren Sheets Jarrell
AMERICAN TORT REFORM ASSOCIATION
1101 Connecticut Ave. NW
Suite 400
Washington, DC 20036
(202) 682-1163

Katherine C. Yarger
  *Counsel of Record*
LEHOTSKY KELLER LLP
700 Colorado Blvd. #407
Denver, CO 80206
(303) 717-4749
katie@lehotskykeller.com

Steven P. Lehotsky
Scott A. Keller
Jeremy Evan Maltz
LEHOTSKY KELLER LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(512) 693-8350

*Counsel for Amicus Curiae*

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4265 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Katherine C. Yarger*
Katherine C. Yarger

## CERTIFICATE OF SERVICE

On November 1, 2022, this brief was served via CM/ECF on all registered

counsel and transmitted to the Clerk of the Court.

/s/ *Katherine C. Yarger*
Katherine C. Yarger